## AFFIDAVIT OF EUGENE A. KEE, JR.

I, Eugene A. Kee, Jr., hereby depose and state as follows:

1. I am a Lieutenant with the Massachusetts State Police ("MSP"), currently assigned to the Bank Robbery Task Force (the "Task Force") with the Boston Office of the Federal Bureau of Investigation ("FBI"). The Task Force is comprised of Special Agents of the FBI, as well as investigators assigned from the MSP, and the Boston and Cambridge Police Departments. I have been assigned to the Task Force for the past seven years, during which time period I have been involved in the investigation of over two hundred bank robberies. I have been a law enforcement officer for twenty-two years. In connection with my Task Force responsibilities, I have been deputized as a special federal officer.

2. I submit this affidavit in support of a criminal complaint against JASON W. POWERS ("POWERS"), born in 1979, for aiding and abetting bank robbery by force, intimidation and violence in violation of 18 U.S.C. §2113(a) and 18 U.S.C. §2. The information set forth in this affidavit is based upon my own investigation, my review of bank surveillance photographs, discussions with other law enforcement officers, the recovery and inspection of evidence from the person of JOHN W. SCHURKO ("SCHURKO"), a separately charged individual also involved in the conduct described below, and my conversations with POWERS. In submitting this affidavit, I have not included each and every

fact known to me about the investigation, but only those facts which I believe are sufficient to establish the requisite probable cause.

3. On Wednesday, September 3, 2003 at approximately 12:50 p.m., a white male robbed the DANVERS SAVINGS BANK, 400 West Cummings Park, Woburn, Massachusetts (the "bank"), the deposits of which I know are insured by the Federal Deposit Insurance Corporation. I and other Task Force personnel responded to the bank shortly after the robbery. We learned that the robber entered the bank through the front entrance, and immediately yelled at the bank employees words to the effect: "This is a robbery." One victim described the robber's demeanor to be "angry and violent like he wanted violence." Witnesses reported that the robber stated: "Shut the fuck up, give me all your money, or I'll shoot you. Don't let me jump over this thing. Get the fuck over here, open the drawer, give me all the money, go to the second drawer, you put a dye pack in, I'll come back and shoot you." After the robber took money from a victim teller, he then ordered the bank employees away from the teller drawers, demanded hundreds and fifties, and again threatened: "Or I'm going to start shooting." A bank employee reported that the robber knew about the second cash drawer and about the back room where the vault was located. The employees had trouble opening the vault and were unable to do so upon demand of the robber, who

2

then fled the bank with the money obtained from bank personnel. A subsequent audit by bank employees determined that the robber left the bank with six thousand and seventy six dollars ($6,076.00), including ten $10 bills whose serial numbers had previously been recorded by bank personnel (the "bait money").

4. The robber was described by employees as being a white male, 6' to 6'2" in height, 190-200 pounds, thirty to thirty-five years of age. The robber was further described as wearing a baseball cap, black sunglasses, a dark blue or black bandana with a white pattern, covering his face from the nose down, a dark colored nylon windbreaker with a middle pouch pocket, and black or navy blue cotton sweat pants. The robber was also reported to be carrying and waving a large, dark-colored handgun as he made his demands.

5. I also learned that an individual standing in a building nearby was looking out the window of the building at the bank at the time of the robbery. This individual observed a person exit the bank and enter the passenger side of a vehicle, after which the vehicle drove away from the area at a high rate of speed. According to the witness, the person exiting the bank was wearing a heavy, bulky, puffy, shiny royal blue windbreaker, a baseball hat and what appeared to be a black scarf covering his face.

6. I have known SCHURKO for a number of years and am familiar with his appearance and his prior criminal history,

3

which includes a prior attempted bank robbery. At the time of the bank robbery on September 3, 2003, I knew SCHURKO was on supervised release from a federal attempted bank robbery conviction and was living at a half-way house in Everett, Massachusetts. As the initial bank robbery call came in to the Task Force squad area shortly after the bank was robbed, I heard the description of the robber given as a "large-framed, white male, 6' in height, and armed." I immediately asked other members of the Task Force to canvass the Everett area in hopes of locating SCHURKO. MSP personnel assigned to the Middlesex County District Attorney's CPAC Unit and the Everett Police were also notified to be on the lookout for SCHURKO as a possible suspect in the robbery. Law enforcement personnel were also informed, or already knew, that within the prior few days a federal probation/supervised release violation arrest warrant had been issued by the federal court in Boston for SCHURKO and was then outstanding.

7. As I responded to the bank that afternoon to conduct the investigation with other members of the Task Force, along with Woburn police officers and detectives, it was reported that the getaway vehicle used by the robber (and, as I later learned, driven by POWERS) had been recovered in the parking lot around the corner from the bank. A later check of law enforcement records revealed that the getaway vehicle had been reported

stolen the night before in the city of Malden, Massachusetts.

8. Bank surveillance photographs (of excellent quality) depicting the robber were obtained by Task Force personnel. I have reviewed the photographs and they depict a large-framed white male wearing a baseball cap, dark sunglasses, a dark bandana with a light-colored pattern design, a blue nylon windbreaker with a pouch pocket, and dark gloves. What appears to be a white tee-shirt is visible under the windbreaker. One photograph appears to depict a large handgun in the robber's right hand. In one of the photographs the robber is seen putting money into the pouch of his windbreaker with his gloved left hand. The sleeve of the windbreaker is pulled-up above the wrist, exposing a large wristwatch. The robber depicted in the surveillance photographs is consistent in race and body size with SCHURKO. Although I believe the robber depicted in the surveillance photos to be SCHURKO based upon my familiarity with his appearance, the robber is covered in such a manner that a positive facial identification is not possible.

9. While at the bank, I was notified that Trooper Robert Manning of the MSP had spotted SCHURKO driving a vehicle in the area of Ferry Street and Carlson Street in Everett. SCHURKO was subsequently placed under arrest at the intersection of Ferry Street and Shute Street on the outstanding federal supervised release arrest warrant by Special Agent Gary Cacace of the Task

Force, who was assisted by MSP personnel and Everett police and detectives. At the time of arrest (approximately 2:30 p.m.), Special Agent Cacace informed me by telephone that SCHURKO, dressed in white shorts and a white tee shirt, had in his possession $3,420.00 in U.S. currency.

10. Peter Shabowich of the bank provided investigators with the serial numbers of the bait money that was included in the money taken by the robber. All ten of the $10 bills recorded as bait money and taken by the robber were part of the $3,420 of U.S. currency found and recovered from SCHURKO when he was arrested in Everett about one hour and 40 minutes after the robbery of the bank.

11. After reviewing the bank surveillance photos at the bank that afternoon, and after learning of SCHURKO'S arrest, I contacted Special Agent Cacace at the Everett Police Department and asked if SCHURKO was wearing a watch at the time of his arrest. Special Agent Cacace advised that SCHURKO did in fact have a watch in his possession and described it as having a large face, black and silver in color. As a result of this conversation, the watch was seized as evidence and later photographed by FBI personnel. In my opinion, the robber's wristwatch visible in the bank surveillance photos and SCHURKO'S wristwatch appear to be identical, or at least to be of an identical type.

12. Special Agent Cacace has also advised me that at the time of his arrest, SCHURKO was wearing a white tee shirt that is consistent with the color of the shirt visible under the robber's windbreaker in the bank surveillance photographs.

13. A few weeks after the robbery, this affiant and Trooper Manning spoke with POWERS about the incident. POWERS stated that he was the driver of the getaway car used during the above-described robbery. POWERS explained that the night before the robbery, he was driving with SCHURKO when they saw a white car with the driver's side door open and the engine running. SCHURKO got out of POWERS' car and ran over to the white car, got into it a drove away. The next morning (the morning of the bank robbery), SCHURKO and POWERS drove POWERS' girlfriend's car to a parking lot to pick up the stolen car. They then drove both cars to the area of the DANVERS SAVINGS BANK and parked POWERS' girlfriend's car a short distance from the bank. SCHURKO then instructed POWERS to put on gloves, and drive the stolen car. According to POWERS, he believed that SCHURKO intended to commit a "smash and grab" jewelry store robbery, and did not know prior to the robbery that SCHURKO was armed with a gun or that SCHURKO intended to rob a bank. At SCHURKO's instruction, POWERS stopped the car, and SCHURKO got out of the car wearing, according to POWERS, a light blue windbreaker, a baseball cap, a black and white bandana, sunglasses and gloves.

14. Approximately two and half minutes later SCHURKO reentered the car, and instructed POWERS to drive away. SCHURKO and POWERS then abandoned the stolen car and returned to POWERS' girlfriend's house by means of her car. SCHURKO showed POWERS the money he had stolen from the bank and the gun he had used during the robbery. SCHURKO also gave POWERS approximately $2,200 to $2,400 of the robbery money. SCHURKO also gave POWERS the gun he had used during the robbery, and asked POWERS to hide the gun for him.

15. POWERS gave to this affiant and Trooper Manning the gun that he says SCHURKO asked him to hide. The gun appears to be a large, black handgun, but is actually only capable of firing pellets. The gun POWERS gave me is similar in size to the gun held by the bank robber that appears to be visible in the bank's surveillance photos.

16. Based on the foregoing, I have probable cause to believe that on September 3, 2003, JASON W. POWERS did aid and abet the taking, by force and violence, and by intimidation, from the persons and presence of others, money, in the amount of $6,076, more or less, in the care, custody, control, management or possession of the DANVERS SAVINGS BANK, 400 West Cummings Park, Woburn, Massachusetts, a federally insured financial

institution, in violation of Title 18, United States Code, Sections 2113(a) and 2.

*Eugene A. Keefe*
EUGENE A. KEE, JR.
Lieutenant, Massachusetts
State Police
Special Federal Officer


Subscribed and sworn to before me this 2nd day of December 2003.

CHARLES B. SWARTWOOD, III
United States Magistrate Judge